UNITED STATES of America,
Plaintiff–Appellee,

v.

Burl Allen PEVETO, Jr.,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Melvin Ray RODGERS,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Carl Eugene HINES, a/k/a Geno
Hines, Defendant–Appellant.

Nos. 88–1061, 88–1113 and 88–1116.

United States Court of Appeals,
Tenth Circuit.

July 26, 1989.

Order on Denial of Rehearing and
Rehearing En Banc Oct. 30, 1989.

Don Ed Payne, Payne and Welch, Hugo, Okl., for defendant-appellant Burl Allen Peveto, Jr.

Julian K. Fite, Muskogee, Okl. (Betty Outhier Williams, Muskogee, Okl., was also on the brief), for defendant-appellant Melvin Ray Rodgers.

Stephen J. Greubel, Asst. Federal Public Defender, Tulsa, Okl., for defendant-appellant Carl Eugene Hines.

Paul G. Hess, Asst. U.S. Atty., E.D. Okl., Muskogee, Okl. (Roger Hilfiger, U.S. Atty., E.D. Okl., Muskogee, Okl., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, BRORBY, Circuit Judge, and SAFFELS, District Judge *.

HOLLOWAY, Chief Judge.

These three appeals were companioned for argument. Defendant Carl Eugene

* The Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

Hines (Hines) appeals his five count conviction for violating and conspiring to violate narcotics laws and for traveling in interstate commerce to promote narcotics manufacturing. Defendant Burl Allen Peveto, Jr., (Peveto) appeals his one count conspiracy conviction. We affirm their convictions and sentences. Defendant Melvin Ray Rodgers (Rodgers) appeals his four count conviction for violating and conspiring to violate narcotics laws, arguing in part that co-defendant Hines presented an antagonistic and mutually exclusive defense and that the trial court abused its discretion in denying his motion to sever. We agree and because Rogers was denied a fair trial, we reverse his conviction and remand for a new trial.

I

## Factual Background

On June 24, 1987 special Drug Enforcement Administration (D.E.A.) agents stopped a man named Gilbert Glasgow (Glasgow). While under surveillance Glasgow had purchased some laboratory equipment for Hines. Glasgow R. 5–7. The equipment included a boiling flask, separatory funnels, glass stoppers, plastic tubing, elbow fittings and stopcock grease. Glasgow R. 8–9. The United States Attorney's Office agreed not to prosecute Glasgow in return for his help in the investigation of Hines and Peveto, a disbarred lawyer. Glasgow R. 6.

Glasgow had known Peveto and Hines for several years. Glasgow R. 5. Hines introduced Rodgers to Glasgow on approximately June 21 or 22, 1987. Glasgow R. 5. On June 23 and 24, 1987, Rodgers rented a room at the Winchester Inn in Moore, Oklahoma. III R. 167–168. Glasgow delivered the laboratory equipment he had purchased to Hines and Rodgers at the Winchester and talked with them about the equipment and whether it met their expectations. Glasgow R. 11, 27–30.

## A.

### Search of the Bryan County House

The investigation continued and on August 1, 1987 a home located in Bryan county, which belonged to Rodgers' brother, was searched. III R. 23–24. There was no furniture in the home, but numerous laboratory supplies were found, including beakers, flasks, a large crockpot containing amber colored liquid, an eggwhip attached to a rubber hose, a bottle of hydrogenchloride gas, rubber tubbing, and acetone. III R. 37–39. There was a dense fog in the house and a "very strong odor of ether." III R. 23–24. A three foot by four foot mirror was found in the bathroom with a large amount of white powdery substance on it, later determined to be amphetamine. III R. 39, 80–82. Round paper filters were found near the mirror, along with a triple beam scale, and some packaged amphetamine. III R. 39. Fourteen pounds of amphetamine were found and enough amphetamine oil to manufacture another 30 pounds.[1] III R. 84–85. Glasgow said that some of the laboratory equipment at the house was equipment he had purchased for Hines. Glasgow R. 8–10.

Two loaded handguns were also found in the Bryan county home. III R. 48–49. Rodgers, Hines' wife, and co-defendant John Williams were arrested and taken into custody. III R. 24–25. Hines was found hiding in the attic and was also arrested and taken into custody. III R. 25–26, 54–55.

## B.

### Search of Hines' and Peveto's Apartments

According to Hines' trial testimony, he and Peveto moved from Sherman, Texas to some apartments in Irving, Texas in July of 1987. V R. 478. Hines told Glasgow on July 7, 1987 that he wanted to purchase some apartments for dope houses. Glasgow R. 35–36. When talking with Glasgow about who would assist in the purchase of

---

1. There was testimony that the defendants were in the powdering stage of the manufacturing process, where the amphetamine oil is changed into powder. III R. 66. And there was testimony that the various laboratory equipment found could be used for powdering out. III R. 84.

the houses Hines "wrote the word 'lawyer' on a piece of paper and pointed behind him." Glasgow R. 39. Glasgow knew that Peveto was a lawyer and thought Hines was referring to Peveto. Glasgow R. 39. Glasgow had talked with Hines before moving to Irving. Glasgow R. 40. And when Hines moved to Irving he gave Glasgow both his and Peveto's new telephone numbers. Glasgow R. 37–38.

On August 5, 1987, Peveto's apartment was searched and Peveto was arrested.[2] A van registered to Hines' son, and seen earlier the same day at Hines' apartment, was found in Peveto's locked garage. IV R. 281–282. Precursor chemicals[3] were found inside the van. III R. 177–180. D.E.A. chemist Goldstein testified that 120 pounds of amphetamines could have been manufactured with the chemicals found in the van. IV R. 332. There was evidence that the ether found in the van was similar to that found in the Bryan county home. II R. 58. A traffic citation issued to Peveto was found. IV R. 315. A set of triple beam scales, a set of electric scales, a minuscule amount of amphetamine, a number of bottles, and some stickers were also found in Peveto's apartment. III R. 130, 180; IV R. 315–316.

On the same day Hines' apartment was searched.[4] A receipt for the chemicals matching those found in the van at Peveto's apartment and costing $6,888.18 was found. IV R. 262–263. Approximately one thousand small bottles were found in the garage, along with some stickers. IV R. 237.

Rodgers, Hines, Peveto, and Williams were charged in a seven count indictment. Williams alone was charged in count five with possession of cocaine; the jury acquitted him of that charge and all other charges. Rodgers was charged with knowingly and intentionally manufacturing amphetamine/methamphetamine in count one;

possession with intent to distribute amphetamine/methamphetamine in count two; possession of amphetamine oil with intent to manufacture amphetamines in count three; and conspiracy to manufacture and distribute amphetamine/methamphetamine from May 29, 1987 to August 5, 1987 in count four, violations of 21 U.S.C. § 841(a)(1) (1982), 18 U.S.C. § 2 (1982) and 21 U.S.C. § 846 (1982). Hines was charged in those same four counts, and in addition, was charged in count six with traveling in interstate commerce with the intent to promote narcotics manufacturing, a violation of 18 U.S.C. § 1952 (1982) and 18 U.S.C. § 2 (1982). He was also charged in count seven with the knowing and intentional possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (1982) and 18 U.S.C. § 2 (1982). Peveto was charged only with conspiracy.

### C.

*Hines' Defense*

Hines presented his defense first. To Rodgers' surprise, he put on evidence to show that he was working as a government agent. Revere Christophe, an employee of the Harrison County Sheriff's office, was introduced to Hines in 1984 or 1985 by Clifford Lee, a detective with the Oklahoma City Police Department. IV R. 375. Christophe talked to Hines about his desire to work as an agent and Hines in fact assisted in narcotics investigations. IV R. 375. Charles Lugo, supervisor for intelligence of the Drug Enforcement Administration in the Department of Justice, Los Angeles Division, said that Hines worked as a informant in a heroin trafficking investigation in the Dallas area in 1985. IV R. 394. And Special F.B.I. agent Michael Miller testified that he met with Hines and Lee in March of 1987 to discuss the possibility of Hines becoming an informant and said

2. Facts relating to the manner of the search are set forth below in part II A. (i).

3. A precursor chemical is a chemical which, when mixed with another chemical, makes a compound such as phenylacetone. Phenylacetone can then be used to manufacture amphet-

amine. III R. 322. The van contained boxes of chemicals and containers of ether. III R. 178–179.

4. The apartment was occupied on the day of the search by Hines' son and his family.

they specifically discussed information regarding Peveto. IV R. 400–402.

Hines said that he was working to set up drug dealers for Lee, so that he could be approved as an informant. IV R. 443–446. He said that he "came in contact with Mr. Peveto" and that he had a woman named Jo Jo Butler buy narcotics from Rodgers. IV R. 445–446. He said that he became acquainted with Rodgers and Peveto "so [he] could build a foundation to turn into the parole board to do the next case on." IV R. 449. Hines admitted buying glassware and chemicals, but said it was all part of his work as an informant. IV R. 448–457.

### D.

### *Rodgers' Defense*

Rodgers was last to put on his defense. He had lived in the home owned by his brother in Bryan county, but had returned the home to his brother just weeks before the search. V R. 559–560. He said that on the day of the search he had gone to the house to pick up some appliances and furniture. V R. 542. A car which he had sold Hines earlier was at the house, so he knew Hines was there. V R. 543. He said that after he had entered the house, Hines would not let him leave so that he was there when the house was searched. V R. 544–545. He saw the weapons and said he was afraid to leave against Hines' will. V R. 544–545.

Rodgers' attorney objected strenuously when Hines elicited testimony supporting his defense. IV R. 445. *See also* IV R. 403–404. The trial court overruled the objection, refusing to grant a severance. IV R. 445. Rodgers had no record of previous felony or misdeameanor convictions. V R. 539. The only evidence that he was involved in prior narcotics dealing was presented through Hines' testimony in support of his defense. IV R. 446. And Hines' attorney relied in closing argument upon the testimony regarding Rodgers' drug involvement to strengthen Hines' defense. V R. 603.

### E.

### *Peveto's Defense*

Peveto put on no defense evidence individually. His counsel attempted to develop by cross-examination of other witnesses the lack of Peveto's involvement in the alleged conspiracy, the only charge against him.

### F.

### *The Jury's Verdict*

At the close of the government's case, the court granted Hines' motion for judgment of acquittal as to count seven. The jury acquitted Williams of all charges. Rodgers, Hines and Peveto were found guilty on all remaining counts. Each defendant filed a timely notice of appeal. Many arguments are raised on appeal. We turn first to Peveto's arguments regarding various evidentiary rulings which if well taken, will have a substantial effect on arguments regarding the sufficiency of the evidence.

### II.

### *Analysis*

### A.

### *Evidentiary Matters*

Peveto raises three evidentiary issues: the trial court's denial of his pre-trial motion to suppress, the admission of informant Glasgow's testimony under the coconspirator exception to the hearsay rule, and the admission of a traffic ticket found in his apartment during the search.

### (i)

### *Denial of Peveto's Motion to Suppress*

Peveto's apartment was searched on August 5, 1987. Among the items found were a small plastic vial containing a miniscule amount of amphetamine, chemicals obtained from a van parked in Peveto's garage, a traffic citation issued to Peveto, a set of triple beam scales, and a set of electric scales.

■ Peveto filed a pre-trial motion to suppress, arguing that the affidavit supporting the warrant was not sufficient to establish probable cause. I R. 13. After a hearing, the trial court denied the motion. The court held that affiant Rande Matteson, a special D.E.A. agent, had sufficiently observed and verified the acts performed by the confidential informant to establish reliability, and had alleged sufficient facts in the affidavit to establish a fair probability that contraband or evidence of a crime would be found in Peveto's apartment, in accordance with *Illinois v. Gates,* 462 U.S. 213, 238–239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). I R. 29.

In *Gates,* the Supreme Court held that a magistrate should consider the totality of the circumstances when determining whether probable cause exists to issue a search warrant:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* 462 U.S. at 238, 103 S.Ct. at 2332. We have noted that a magistrate's determination of probable cause should be paid "great deference." *United States v. Orr,* 864 F.2d 1505, 1508 (10th Cir.1988). Our duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *United States v. Martinez,* 764 F.2d 744, 746 (10th Cir.1985) (quoting *Gates,* 462 U.S. at 238–239, 103 S.Ct. at 2332).

Here, the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant. As the trial court found, agent Matteson testified in his affidavit: (1) that Peveto was a disbarred lawyer without an identifiable occupation; (2) that Peveto was an associate of Hines, the primary suspect in the D.E.A.'s investigation; (3) that Hines and Peveto lived in the same apartment complex in Sherman, Texas before they both moved to the Irving, Texas complex; (4) that Peveto had driven a van owned by Hines' son; (5) that informant Glasgow was told by Hines that "the lawyer" could conceal the ownership of dope houses and that Glasgow believed Hines was referring to Peveto; (6) that the affiant had seen a Lincoln registered to Barbara Peveto near Hines' apartment; (7) that Hines' address book, found during the August 1, 1987 search, contained several telephone numbers for Peveto; and (8) that Peveto had been investigated on three occasions since 1984 for possible controlled substance violations. I R. 29. *See also* I R. 13, Exh. B. While any one of these circumstances might by itself be insufficient to establish probable cause, we conclude that considering the "totality-of-the-circumstances," *see Massachusetts v. Upton,* 466 U.S. 727, 732–733, 104 S.Ct. 2085, 2087–2088, 80 L.Ed.2d 721 (1984) (Per Curiam), the magistrate had a substantial basis for concluding that probable cause existed. *Gates,* 462 U.S. at 238–239, 103 S.Ct. at 2332.

■ Peveto also argues that the officers who searched his apartment failed to announce their authority and purpose before entering, in violation of 18 U.S.C. § 3109 (1982).[5] "If the record clearly establishes the defendants' contention that the executing officers failed to announce their authority and purpose before forcibly entering the dwelling, and that no exigent circumstances were shown, the evidence must be suppressed as the fruit of an unlawful search." *United States v. Ruminer,* 786 F.2d 381, 383 (10th Cir.1986) (citing *Sabbath v. United States,* 391 U.S. 585, 586, 589, 88 S.Ct. 1755, 1756, 1757–1758, 20 L.Ed.2d 828 (1968)). There is a presumption of government propriety, however, and

---

5. Section 3109 provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

the defendant bears the burden to establish a prima facie case by putting on some evidence that § 3109 has been violated. *United States v. Gardner,* 553 F.2d 946, 949 (5th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978).

There is some question whether Peveto properly raised the issue below, a prerequisite to arguing the issue on appeal.[6] Assuming the issue was not waived, we think Peveto failed to establish a prima facie case that § 3109 was violated. The only evidence presented on this issue was agent Matteson's testimony that the execution of the search warrant was turned over to the Irving, Texas Police Department and that they may have entered by kicking the door in. II R. 85. Matteson was not present and could not say whether they knocked or otherwise announced their presence before entering. II R. 85. When Peveto raised the issue at trial, the trial judge held that there was "no evidence of excessive force in executing the warrant at the suppression hearing" and announced that the motion had been denied. IV R. 232.

We accept the trial court's findings of fact unless clearly erroneous when reviewing the denial of a motion to suppress, considering the evidence in the light most favorable to the government. *Ruminer,* 786 F.2d at 383. *See also United States v. Remigio,* 767 F.2d 730, 732–733 (10th Cir. 1985), *cert. denied,* 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985). Here, there is no evidence to establish the defendant's contention "that the executing officers failed to announce their authority and purpose before forcibly entering the dwelling" and that is the kind of evidence which is

required to demonstrate a violation of § 3109. *See Ruminer,* 786 F.2d at 383. Accordingly, we find no error in the denial of Peveto's motion to suppress.

(ii)

*Admission of Co-conspirator Testimony*

■ Peveto argues that the trial court erred in admitting Glasgow's testimony of a conversation with co-defendant Hines on July 7, 1987. Glasgow recounted a conversation in which Hines said that "he wanted to purchase some apartment buildings to be used for dope houses," *see* Glasgow R. 36, and that ownership of the properties "could be concealed," *see* Glasgow R. 36, whereupon Hines "wrote the word 'lawyer' on a piece of paper and pointed behind him." Glasgow R. 39. Glasgow knew that Peveto was a lawyer and he knew that Peveto lived in the same apartment complex with Hines, the complex where this conversation took place. Glasgow R. 39. Over strenuous objection by Peveto, the trial court admitted the testimony under Fed.R.Evid. 801(d)(2)(E),[7] stating that:

Well, as thin as it is, I find that the Government has shown by substantial independent evidence that it is more likely than not that a conspiracy existed, and that this man who's on the witness stand now, and all these defendants were members of the conspiracy. And so long as it's on the 23rd or 24th that the statements were made during the course of the conspiracy, and I presume there [sic] are in the furtherance of the object of the conspiracy or you wouldn't be presenting them, and I so find.

---

**6.** Peveto's pre-trial motion to suppress does not cite to § 3109, although it does generally state that the "warrant was served and executed with excessive and unnecessary force and violence...." I R. 13. When the issue was raised again at trial, the trial judge stated that the issue had not been raised prior to trial, or at least not raised specifically, and indicated his conclusion that the issue had been waived. III R. 205–206. Rule 12(f) of the Federal Rules of Criminal Procedure presumes that motions to suppress under Rule 12(b)(3) which are not raised prior to trial have been waived. *See United States v. White,* 766 F.2d 22, 25 (1st Cir.1985); *United States v. Baker,* 638 F.2d 198, 202 (10th Cir. 1980). Because we think it clear that Peveto

failed to establish a prima facie case that § 3109 was violated, we do not ground our affirmance of the trial court's denial of the motion to suppress on waiver.

**7.** Fed.R.Evid. 801 provides, in pertinent part that:

(d) **Statements which are not hearsay.** A statement is not hearsay if— ...

(2) **Admission by party opponent.** The statement is offered against a party and is ... (E) a Statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Glasgow R. 24. This finding was made before Glasgow offered Hines' testimony at issue and after five witnesses had testified, including Dondi Albritton.

Albritton, an A.T.F. agent, said that Peveto and Hines lived in the same apartment complex in Sherman, Texas before moving to Irving, Texas. III R. 121–123. He also identified both Hines and Peveto and said that he had assisted in searching both apartments and that he found a set of triple beam scales in Peveto's apartment. III R. 123, 130. It was at this point that Glasgow testified. III R. 163. Before the hearsay objection was interposed, Glasgow had identified Peveto and had testified about Glasgow's purchase of laboratory equipment and the meeting with Hines and Rodgers at the Winchester.

■ Hearsay statements of a co-conspirator are properly admitted pursuant to Rule 801(d)(2)(E) if, by a preponderance of the evidence, the trial court finds that: (1) a conspiracy existed; (2) the declarant and the defendant were members of the conspiracy; and (3) the hearsay statements were made in the course and in furtherance of the conspiracy. *United States v. Esch*, 832 F.2d 531, 537 (10th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988); *United States v. Hernandez*, 829 F.2d 988, 993 (10th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988). The court may examine the hearsay statement sought to be admitted, along with independent evidence, in making a preliminary factual determination that a conspiracy existed for purposes of Rule 801(d)(2)(E). *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). We review findings made which premise the admission of hearsay statements under the clearly erroneous standard. *United States v. Smith*, 833 F.2d 213, 221–222 (10th Cir.1987).

Peveto does not challenge the trial court's finding that Hines' statement was made in the course of the conspiracy. Nor does he challenge the trial court's finding that the statement was made in furtherance of the conspiracy. Statements "intended to promote the conspiratorial objectives" are made in furtherance of the conspiracy as are statements "identifying a fellow coconspirator." *Smith*, 833 F.2d at 219 (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir.1986) and *United States v. Handy*, 668 F.2d 407, 408 (8th Cir.1982)). Instead, he argues that the evidence was "insufficient to establish that [he] had entered into a conspiracy with any of the co-defendants." Principal Brief of Defendant–Apellant Peveto, p. 18.

The evidence which the trial court had before it showed that Peveto had been associated with Hines. They lived in the same apartment complex in Sherman, Texas and moved to the same complex in Irving, Texas. Agent Albritton testified that he found a triple beam scale during the search of Peveto's apartment. And State Trooper Randy Moore, *see* III R. 22, investigator Gary McCain, *see* III R. 34, chemist Richard Dill, *see* III R. 68, and chemist Reanae Ham, *see* III R. 106, had previously testified about the search of the Bryan County house and the laboratory equipment and narcotics evidence found there. Furthermore, the statement at issue—that ownership of dope houses could be concealed by a lawyer whom Glasgow understood to be Peveto—may also be considered in determining whether the government demonstrated by a preponderance of the evidence that Peveto was a member of the conspiracy. *Bourjaily*, 107 S.Ct. at 2782.[8]

8. Peveto's argument that the statement at issue cannot be considered in making the Rule 801(d)(2)(E) determination because the trial court did not consider it is without merit. In view of the Court's holding in *Bourjaily* regarding consideration of the statement itself, and the breadth of the trial record that may support findings under Rule 801(d)(2)(E), we reject Peveto's argument. *See Hernandez*, 829 F.2d at 993–995 (the co-conspirator statement may be conditionally admitted and connected up by subsequent evidence).

In reaching the conclusion that the trial court abused its discretion in admitting Glasgow's testimony, the dissent overlooks some highly significant evidence which connects Peveto to the Bryan County house and which may be considered in reviewing the 801(d)(2)(E) determination. While the dissent acknowledges the significance of the chemicals found in the van in Peveto's locked garage, it fails to acknowledge

Given all this evidence, we do not think that the trial court's finding that the government demonstrated by a preponderance of the evidence that Peveto was a member of the conspiracy was clearly erroneous. The admission of Glasgow's testimony under 801(d)(2)(E) was not error.

### (iii)

*Admission of Peveto's Traffic Ticket*

■ Over Peveto's objection that it was hearsay evidence and that its admission deprived him of his Sixth Amendment right to confront witnesses, the trial court admitted a traffic ticket found during the search of Peveto's apartment. IV R. 252. The ticket tied Peveto to the van (which contained the precursor chemicals) found in his garage on the day of the search. The government offered the ticket to show that Peveto had driven the van and therefore had some control over it.[9] The court admitted the ticket, after determining that it was hearsay, reasoning that it had sufficient reliability for admission. IV R. 252.

We uphold the admission of the traffic ticket for reasons not articulated by the trial court. "An out-of-court statement is hearsay only if it is offered for its truth." *United States v. Shepherd,* 739 F.2d 510, 514 (10th Cir.1984) (orders or instructions by one person to another admitted to show that they occurred rather than to prove their truth held not hearsay). Evidence which is offered as circumstantial evidence of a conspiracy and not to prove the truth of the facts asserted is not hearsay evidence.[10] *See* Fed.R.Evid. 801(c); *United States v. Markopoulos,* 848 F.2d 1036, 1038–1040 (10th Cir.1988) (affirming admission of a notebook listing defendant's home and business phone numbers offered as circumstantial evidence of conspiracy). *See also United States v. Canieso,* 470 F.2d 1224, 1232–1233 (2nd Cir.1972) (affirming the admission of a letter which "dovetailed" with other evidence, circumstantially giving rise to indirect inferences, but not as assertions to prove the truth of the matters asserted therein).

Here, the van which contained the chemicals was found in Peveto's *locked* garage and the traffic ticket was found in Peveto's bedroom. The government introduced the ticket not to prove the truth of any matters

---

the testimony that those chemicals were "similar to the chemicals that were found in Oklahoma." II R. 58. And while the van belonged to Hines' son, the traffic citation issued to Peveto and found in Peveto's apartment showed Peveto's connection to the van. We also note that triple beam scales were found in Peveto's apartment and in the Bryan County house. Moreover, bottles and stickers of the same kind were found at Peveto's and Hines' apartments. There was also testimony that Hines had given Glasgow both his and Peveto's telephone numbers after their move to Irving, Texas. *See* part II. B., *infra.*

As the dissent acknowledges, the co-conspirator statement may be connected up by this subsequent evidence. *Hernandez,* 829 F.2d at 993–995. And we view this evidence as a whole and not in its isolated parts. *Cf. Bailey v. United States,* 410 F.2d 1209, 1215–1216 (10th Cir.1969) (evidence connecting defendant to a crime, viewed cumulatively, was adequate to support an inference of participation). Considering the evidence reviewed above, the long term association of Hines and Peveto, and the hearsay statement itself, we do not think the trial court's finding that Peveto was a member of the conspiracy was clearly erroneous. The trial court was within its discretion to admit the Glasgow testimony under Rule 801(d)(2)(E). *Hernandez,* 829 F.2d at 995 (reviewing the admission of

co-conspirator testimony for an abuse of discretion).

9. When asked by the court to explain the purpose of the ticket's admission, counsel for the government stated:

> Your Honor, it [the ticket] was found in Mr. Peveto's bedroom. The van was also found in Mr. Peveto's locked garage. We would say they are both tied in, in that the ticket or summons for a traffic violation relates to the van. It also relates to the address given as shown on it. I think that it speaks for itself as to whether or not it's reliable.

IV R. 251–252.

10. Rule 801(c) includes "within the hearsay concept only those statements offered to prove the truth of the matter asserted. [footnote omitted]. Only then are hearsay dangers present." 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(c)[01] at 801–67 (1989). *See also* 6 Wigmore, *Evidence* § 1766 at 177–178 (3d ed. 1940) and McCormick, *Evidence* § 246 at 584 (2d ed. 1972) ("Hearsay evidence is testimony in court, or written evidence of a statement made out of court, the statement being offered as an assertion to show the truth of the matter asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.").

asserted on it, but to tie Peveto to the van. IV R. 251–252. No reference to the truth of the matters asserted on the ticket (i.e., the nature of the traffic violation) was made by the government either during its examination of witnesses or during closing argument. *See e.g. United States v. Hernandez*, 750 F.2d 1256, 1257–1259 (5th Cir. 1985) (prosecutor's argument relevant in determining whether evidence was offered to prove the truth of the matter asserted). The existence of the ticket, not its assertions, was the point of its admission. It helped to show circumstantially Peveto's connection to the van. We find no error in its admission.

### B.

*Failure to Prove a Single Conspiracy*

■ Each of the defendants argue that the government failed to prove a single conspiracy and instead offered proof either of multiple conspiracies or of various uncharged acts. Count four of the indictment alleges a single conspiracy between all four co-defendants to "manufacture, possess with intent to destribute, and possess with intent to manufacture amphetamine/methamphetamine...." I R. 2.

In *Kotteakos v. United States*, 328 U.S. 750, 771–774, 66 S.Ct. 1239, 1251–1252, 90 L.Ed. 1557 (1946) the Court held that the defendants' substantial rights were violated where the government charged only one conspiracy, but presented proof of multiple conspiracies. *See also United States v. Butler*, 494 F.2d 1246, 1254–1257 (10th Cir. 1973). The Court recognized that guilt "remains individual and personal, even as respects conspiracies." *Kotteakos*, 328 U.S. at 772, 66 S.Ct. at 1251. The defendant has a "right not to be tried *en masse* for the

conglomeration of distinct and separate offenses committed by others...." *Id.* at 775, 66 S.Ct. at 1252–1253.

We emphasize initially that "whether the evidence was sufficient to establish a single conspiracy is a question of fact for the jury to decide. [footnote omitted]" *United States v. Record*, 873 F.2d 1363, 1366 (10th Cir.1989) (citing *United States v. Dickey*, 736 F.2d 571, 581 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985)). To find "a single conspiracy, the jury must be convinced beyond a reasonable doubt that the alleged coconspirators possessed a common, illicit goal." [11] *Dickey*, 736 F.2d at 582 (citing *United States v. Petersen*, 611 F.2d 1313, 1326–1327 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2986, 64 L.Ed.2d 854 (1980)). Proof of separate transactions does not necessarily establish multiple conspiracies. *Id.* Rather, it must be determined "whether such activities constituted essential and integral steps toward the realization of a common, illicit goal." *United States v. Brewer*, 630 F.2d 795, 799–800 (10th Cir.1980) (citing *Petersen*, 611 F.2d at 1326–1327).

Before examining the evidence, we note that we must consider all the evidence, "both direct and circumstantial, in the light most favorable to the government, drawing reasonable inferences and making credibility choices in support of the jury's verdict." *Record*, 873 F.2d at 1367. It "is not the function of this Court to weigh conflicting evidence or consider the credibility of witnesses." *Petersen*, 611 F.2d at 1317.

The evidence in this case admittedly demonstrated a number of separate transactions or occurrences and the government concedes that much of the evidence was circumstantial.[12] There was evidence re-

---

**11.** Having instructed the jury that it must find each essential element of the conspiracy proved beyond a reasonable doubt, the court instructed the jury that:

> To establish proof that a conspiracy existed you must find from the evidence that the members in some way or manner, or through some contrivance, expressly or unexpressly, came to a mutual understanding or agreement to try to accomplish a common and

unlawful plan. The consequence of which if carried out would be unlawful.
V R. 651.

**12.** Circumstantial evidence is sufficient to show unity of purpose, common design, and agreement in a conspiracy prosecution, *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986), and the court so instructed the jury:

garding Glasgow's purchase of laboratory equipment for Hines and delivery of the same to Hines and Rodgers at the Winchester Hotel, along with evidence of their conversation about whether the equipment met their expectations. Glasgow R. 27–30. There was evidence of a previous conversation between Glasgow and Hines on July 7, 1987, at which time Hines told Glasgow that he wanted to purchase some apartment buildings for dope houses and stated that ownership of the properties could be concealed, whereupon he wrote the word lawyer on a piece of paper and pointed behind himself, suggesting to Glasgow that Peveto could conceal ownership of the dope houses. Glasgow R. 35–39. There was also abundant evidence regarding the search of the Bryan County house on August 1, 1987, where laboratory equipment, various supplies and amphetamine were found, and where Hines, Rodgers and Williams were arrested.

We think it clear that the jury could reasonably find from these transactions and occurrences "essential and integral steps toward the realization of a common, illicit goal." *Brewer*, 630 F.2d at 799. *See also Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). There was no furniture in the Bryan County house, but numerous supplies were found, including glassware, along with the narcotics. The jury was certainly entitled to infer that the Bryan County house was the type of dope house Hines was referring to in his conversation with Glasgow.

The search of Peveto's apartment is more troublesome, but we conclude that this evidence is also competent circumstantial proof of a single conspiracy. There was testimony that the ether found in the van in Peveto's *locked* garage was "similar to the chemicals that were found in Oklahoma." II R. 58. There was testimony that the precursor chemicals found in the

van could have been used to manufacture 120 pounds of amphetamine. IV R. 332. And there was testimony that Hines had given Glasgow both his and Peveto's telephone numbers after their move to Irving, Texas. We think this evidence, along with the scales found in Peveto's apartment, the traffic ticket associating Peveto with the van, the trace amount of amphetamine, the bottles and stickers, the long term relationship between Peveto and Hines, and the conversation where Hines suggested to Glasgow that Peveto could conceal ownership of dope houses, is sufficient circumstantial evidence from which the jury could reasonably conclude that Peveto had possession of the precursor chemicals and that such possession was an "essential and integral step toward the realization of a common, illicit goal, the manufacturing of amphetamine." *Brewer*, 630 F.2d at 799. *See also Petersen*, 611 F.2d 1326–1327 (separate transactions or occurrences do not necessarily suggest multiple conspiracies).

Similarly, the evidence relating to the search of Hines' apartment was competent circumstantial proof of a single conspiracy. Hines was the main figure in the conspiracy. A receipt was found at his apartment matching the chemicals found in the van in Peveto's garage, as well as approximately 1000 small bottles, with labels. IV R. 262, 237.

Considering all of the evidence in the light most favorable to the government, *see Record*, 873 F.2d at 1367, we conclude that the jury was entitled to find, as it did, that the evidence established a single conspiracy.

### C.

*Sufficiency of the Evidence to Support Peveto's Conspiracy Conviction*

■ Peveto argues strenuously not only that the evidence was insufficient to estab-

---

The Government is not required to prove a conspiracy by direct testimony or evidence. Ordinarily, such a conspiracy can be proved only by inferences drawn from relevant and competent circumstantial evidence.

• • • •

The law allows you, as members of the jury, to infer the existence of a conspiracy from

things actually done, taking into consideration all the facts and circumstances ... surrounding the conduct of the parties who are charged with the conspiracy.

V R. 651–652. None of the defendants objected to this instruction. *See* V R. 666–667.

lish a single conspiracy, but also that it was insufficient to establish his involvement.[13] It should be remembered here that Peveto was charged only with conspiracy. It is true, as Peveto argues, that his association with Hines is not enough to support his conviction. *United States v. Austin,* 786 F.2d 986, 988 (10th Cir.1986). And the government cannot prove conspiracy only by presenting evidence that places Peveto in a "climate of activity that reeks of something foul." *Id.* (quoting *United States v. Jackson,* 700 F.2d 181, 185 (5th Cir.1983)).

"The essence of the crime of conspiracy is an agreement to commit an unlawful act." *United States v. Dumas,* 688 F.2d 84, 86 (10th Cir.1982). Although the agreement may be inferred from the facts and circumstances of the case and need not take any particular form there must be a meeting of the minds and the defendant must possess at least the degree of criminal intent necessary for the substantive offense itself.[14] *Id. See also Austin,* 786 F.2d at 988. A defendant lacks the requisite criminal intent if he "does not know the conspiracy's objective," *Dumas,* 688 F.2d at 86, and the government must show the defendant's knowledge and agreement

to commit an unlawful act by clear, unequivocal evidence. *Id. See also Austin,* 786 F.2d at 988.

Viewing the evidence "in the light most favorable to the Government to determine whether any rational trier of fact could find [Peveto] guilty beyond a reasonable doubt," *Austin,* 786 F.2d at 988, we conclude that the evidence, summarized in Section II B. above, although circumstantial, is sufficient evidence from which the jury could reasonably conclude that Peveto knew of the conspiracy's objective, agreed to cooperate, and possessed the requisite criminal intent.[15] While there is a lack of direct evidence, we cannot say that reasonable minds could not conclude from the evidence presented that Peveto was guilty beyond a reasonable doubt. *United States v. Kendall,* 766 F.2d 1426, 1431 (10th Cir. 1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986).

### D.

### *Denial of Rodger's Motion to Sever*

▪ Rodgers does not argue on appeal that he and his co-defendants were improperly joined under Fed.R.Crim.P. 8(b).[16] He

---

**13.** Peveto cites testimony that Glasgow did not recall Peveto's name being mentioned, that Glasgow never had a conversation with Peveto during the course of the conspiracy and never saw Peveto, and that Glasgow had no reason to believe that Peveto was involved in any agreement to manufacture amphetamine. Glasgow R. 66–68. Glasgow's testimony is relevant circumstantial evidence, as Peveto argues, and the jury was of course free to consider it. But it is not dispositive. The jury was properly instructed to consider all the evidence, not just this testimony in isolation, in determining whether Peveto was guilty beyond a reasonable doubt. We similarly review all the evidence to determine whether any rational trier of fact could find Peveto guilty beyond a reasonable doubt. *Austin,* 786 F.2d at 988.

**14.** As noted earlier count four charged a conspiracy to "manufacture, possess with intent to distribute, and possess with intent to manufacture amphetamine/methamphetamine...." I R. 1. The court correctly instructed the jury that it would have to find beyond a reasonable doubt that "the particular defendant whose guilt or innocence is being considered knowingly and willfully became a member of the conspiracy." V R. 650. The court also instructed the jury that to "participate knowingly and willfully

means to participate voluntarily and understandingly and with a *specific intent* to do some act the law forbids...." V R. 652 (emphasis added).

**15.** The dissent argues that the trial court abused its discretion in admitting Glasgow's testimony regarding his conversation with Hines and that without this testimony the evidence was insufficient to show that Peveto conspired with Hines and Rodgers. For reasons stated previously, *see* footnote 8, *supra,* we do not think the trial court abused its discretion in admitting Glasgow's testimony. From Glasgow's testimony and the other circumstantial evidence tying Peveto to the conspiracy, the jury could properly find Peveto guilty beyond a reasonable doubt.

**16.** In pertinent part, Rule 8 provides:

**(b) Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

argues that the trial court abused its discretion in denying his motion to sever under Fed.R.Crim.P. 14.[17] The Supreme Court has emphasized that trial courts have "a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). Rodgers objected strenuously to Hines' defense and along with Peveto, requested severance.[18] The trial court overruled the objection. IV R. 445.

We review the trial court's denial of the motion to sever for an abuse of discretion. *United States v. Hayes*, 861 F.2d 1225, 1231 (10th Cir.1988). In determining the merits of a motion to sever, the trial court must "weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *Petersen*, 611 F.2d at 1331. It is not enough for Rodgers to show that severance would have increased his chances of acquittal. *Hayes*, 861 F.2d at 1231–1232. He must make a "strong showing of prejudice." *United States v. Esch*, 832 F.2d 531, 537 (10th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988). He must show that failure to sever resulted in the denial of his right to a fair trial. *Petersen*, 611 F.2d at 1331 (citing *United States v. Butler*, 494 F.2d 1246, 1256 (10th Cir.1974)).

Severance may be necessary when defenses are "so antagonistic that they are mutually exclusive." *Esch*, 832 F.2d at 538 (citing *United States v. Burrell*, 720 F.2d 1488, 1492 (10th Cir.1983)). A mere conflict of theories or one defendant's attempt to cast blame on another does not require severance. *United States v. McClure*, 734 F.2d 484, 488 (10th Cir.1984). Rather, the conflict between co-defendants "must be so intense that there is a danger the jury will unjustifiably infer from the conflict alone that both defendants are guilty." *Esch*, 832 F.2d at 538 (citing *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985)). The defendant must demonstrate that the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other. *United States v. Smith*, 788 F.2d 663, 668 (10th Cir.1986). *See also Swingler*, 758 F.2d at 494–496. When mutually exclusive defenses are presented there is a chance that the jury will infer from the conflict the guilt of both parties. *United States v. Walton*, 552 F.2d 1354, 1361 (10th Cir.1977), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977).

Hines' defense (that he was in the process of becoming an informant and was setting up drug dealers when the Bryan county house was searched) necessitated a showing that Rodgers was a drug dealer and the evidence which he put on tended to show just that. Hines testified that he had a woman named Jo Jo Butler purchase narcotics from Rodgers. IV R. 446. And he said that he became acquainted with Rodgers so that he could "build a foundation to turn into the parole board to do the next case on." IV R. 449. Rodgers had *no criminal record.* V R. 539. This was the only evidence at trial of any criminal behavior on Rodgers' part. We view Hines' testi-

"It is axiomatic that defendants may be charged jointly in the same indictment where they are alleged to have participated in the same act or series of transactions." *Petersen*, 611 F.2d at 1331. Courts generally adhere to the principle that "those indicted together, especially co-conspirators, should be tried together." 8 J. MOORE, W. TAGGART & J. WICKER, MOORE'S FEDERAL PRACTICE ¶ 14.05, p. 14–48 (2 ed. 1989).

**17.** In pertinent part, Rule 14 provides:

 **Rule 14. Relief from Prejudicial Joinder**
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or informa-

tion or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

**18.** In compliance with Fed.R.Crim.P. 12(b)(5) Rodgers filed a pre-trial motion to sever counts five through seven. I R. 7. The trial court denied that motion. I R. 29. In the course of the testimony supporting Hines' defense Rodgers objected and again requested severance. IV R. 445 (incorporating Peveto's objection and earlier request for severance). *See also* IV R. 402–404 (Peveto's request for severance).

mony that Rodgers was at the Bryan county house as a drug dealer as enormously prejudicial, given the charges Rodgers' faced and his defense (that he was at the house to pick up furniture and appliances and was held agaist his will).

Hines' defense was not only prejudicial to Rodgers, but was also mutually exclusive. Rodgers painted himself as innocent too, being held against his will by Hines. If the jury believed that Hines was laying the groundwork as an informant and that Rodgers was a dealer (as Hines said) and was at the house in that capacity, then it would necessarily have to disbelieve Rodger's defense—that he had gone to the house to pick up some furniture and appliances and was being held against his will by Hines. V R. 542–545. The jury's acceptance of Hines' defense would "tend to preclude the acquittal of [Rodgers]." *Smith*, 788 F.2d at 668. We are convinced that the defenses were so antagonistic that they were mutually exclusive. *Esch*, 832 F.2d at 538.

We have noted that the danger that a defendant may be denied a fair trial when confronted with an antagonistic defense is exacerbated when one defendant admits some or all the elements of the charge. *Swingler*, 758 F.2d at 494 (quoting *United States v. Roberts*, 583 F.2d 1173, 1177 (10th Cir.1978), *cert. denied*, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 49 (1979)). Here, Hines admitted buying the glassware and the chemicals, claiming it was all part of his work as an informant. IV R. 448–450. He said that he talked with Glasgow about buying dope houses with the intent of distributing narcotics and he said that "they" (his co-defendants) were "producing amphetamine powder." IV R. 454–455. His admissions directly supported the government's charges. *See United States v. Romanello*, 726 F.2d 173, 177 (5th Cir.1984) (defenses are mutually exclusive where the core of one defense is the guilt of another defendant).

Given Hines' unexpected defense, the jury must surely have been confused when Rodgers asserted that he was being held against his will be Hines. If the jury believed Hines (that he was setting up drug dealers), it had to disbelieve Rodgers (that he was being held against his will). As it turned out the jury found both Hines and Rodgers guilty, apparently rejecting both defenses. As we have noted, when antagonistic defenses are presented, there is a chance that the jury will find from the conflict the guilt of both parties. *Walton*, 552 F.2d at 1361. We are persuaded that Rodgers made a "strong showing of prejudice," *see Esch*, 832 F.2d at 537, and demonstrated as he must, that he was denied a fair trial. *Petersen*, 611 F.2d at 1331. This is a paradigm case of prejudice. Denial of severance to afford a fair trial was prejudicial error.

## E.

### *Denial of Hines' Motion for Mistrial*

■ Count seven of the indictment charged Hines with knowingly and intentionally possessing a firearm as a felon, a violation of 18 U.S.C. § 922(g)(1) (1982) and 18 U.S.C. § 2 (1982). The trial court sustained Hines' motion for judgment of acquittal as to count seven reasoning that "there is absolutely no evidence in this Court's opinion which would link the defendant with the firearm sufficient that a reasonable person ... might find the accused guilty beyond a reasonable doubt." IV R. 363. Hines then moved for a mistrial arguing that when "count 7 was charged and the indictment was read to the jury it obviously contained language concerning him being a prior felon. Now that that's been let out and the jury has heard that, I asked that the case be mistried." IV R. 363.[19]

**19.** Hines emphasizes that he attempted to avoid this situation by filing a motion for severance of count seven. I R. 16, 17. In that motion, he argued that proof of his prior conviction, a necessary element of proof as to count seven, would be inadmissible and irrelevant as to the other counts and would prejudice him. The trial court denied that motion, I R. 29, and we do not think its denial was an abuse of discretion. *See Hayes*, 861 F.2d at 1231; *Petersen*, 611 F.2d at 1331 (in determining the merits of a motion to sever, the trial court must weigh the prejudice to a particular defendant caused by a joinder against the obviously important consid-

Hines argues that failure to grant the mistrial forced him into the untenable position of having to take the stand to explain away the convictions referred to in the indictment, or of having to remain silent, thereby allowing the jurors to speculate as to why he did not take the stand. Hines argues that he was effectively forced to abandon his Fifth Amendment right to remain silent.

The government emphasizes that the court specifically instructed the jury in its preliminary instructions "that an indictment is the method of getting this matter into court and is no inference of guilt of any of the defendants as to any of the crimes with which they are charged." III R. 29. The court further instructed the jury, in its final instructions, that it had:

> dismissed count seven of the indictment which was read to you when you were sworn in as jurors in this case. Therefore you will not consider the guilt or innocence of the defendant Carl Eugene Hines as to count seven of the indictment, *or the evidence pertaining to that count* in your deliberations and determinations.

V R. 646. (emphasis added). And the court again advised the jury that the indictment was not evidence. V R. 646.

■ Where evidence is later ruled inadmissible, a cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error. *United States v. Charmley*, 764 F.2d 675, 677 (9th Cir.1985). We think the court's careful instructions to the jury, in the circumstances of this case,

sufficiently protected Hines' right to a fair trial.[20] The only reference to Hines' prior record was a stipulation entered into between him and the government, *see* I R. 44, and references made by Hines himself *after* the court had granted his motion for judgment of acquittal as to count seven. IV R. 435–436. The government did not elicit testimony regarding the defendant's convictions and did not rely on those convictions in its closing argument.

We review the district court's denial of the motion for mistrial for an abuse of discretion. *See Tolman*, 826 F.2d at 974 (citing *Mares v. United States*, 409 F.2d 1083 (10th Cir.1968), *cert. denied*, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969)). Given the court's cautionary instructions and given the fact that Hines testified about his prior convictions after the court had granted his motion for judgment of acquittal as to count seven, we hold that the court did not abuse its discretion in denying the motion for a mistrial.

## F.

### *Denial of Hines' Motion for Judgment of Acquittal As to Count Six, the Travel Act Count*

■ Hines was charged in count six of the indictment with willfully and knowingly traveling in interstate commerce with the intent to "promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of an unlawful activity to-wit: manufacture of amphetamine/methamphetamine," in violation of the Travel Act, 18 U.S.C. § 1952

---

erations of economy and expedition in judicial administration).

**20.** In *United States v. Tolman*, 826 F.2d 971, 973–974 (10th Cir.1987), the prosecutor informed the jury during his opening remarks that the government would submit fingerprint evidence. The promised evidence was not produced. The defendant argued that the initial expectation created in the jury's mind that such compelling evidence would be introduced tainted its perception of the other evidence. *Id.* at 973. Noting that the court had instructed the jury that opening remarks are not considered as

evidence, we held that the impact of the prosecutor's statements did not so prejudice the defendant that the trial court abused its discretion in denying the motion for mistrial. *Id.* at 973–974. Similarly, in *United States v. Norris*, 780 F.2d 1207, 1212 (5th Cir.1986), the court held that where the jury was instructed to disregard inadmissible testimony (testimony about an instance when several people obtained marijuana out of the defendant's car and when the defendant was arrested for possession of marijuana) it was not error for the trial court not to order a mistrial *sua sponte*.

(1982)[21] and in violation of 18 U.S.C. § 2 (1982).[22] At the close of the government's case, defendant Hines moved for judgment of acquittal as to count six, arguing as he does here, that the evidence was insufficient to show interstate travel and that the government failed to establish the existence of a business enterprise within the meaning of the Travel Act. IV R. 338–339. The trial court denied Hines' motion.

Our standard of review "is the same as the trial court's in ruling on the motion" for judgment of acquittal "in the first instance." *United States v. Miles*, 772 F.2d 613, 615 (10th Cir.1985). We view the evidence in the light most favorable to the government. If there is "substantial evidence from which a jury might properly find the accused guilty beyond a reasonable doubt," *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982), we uphold the denial of a motion for judgment of acquittal.

◼ A Travel Act violation must be supported by proof that a defendant: (1) traveled or used facilities in interstate commerce; (2) with intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of a prohibited activity; and (3) thereafter attempted to or did in fact engage in one of the proscribed activities. *See United States v. Davis*, 780 F.2d 838, 843–844 (10th Cir.1985); *United States v. Kendall*, 766 F.2d 1426, 1434–1435 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). Hines' argument that there was no evidence of interstate travel for the purpose of carrying on the various illegal activities is unpersuasive. There is evidence here that Hines traveled across state lines. He had an apartment in Irving, Texas (in which a receipt for the chemicals matching those found in the van at Peveto's apartment was found, along with 1,000 small bottles and some labels) and was arrested in Bryan County, Oklahoma (where evidence of narcotics and narcotics manufacturing was found). Hines also financed and directed the purchase of glassware by Glasgow. Glasgow R. 7–8, 25. He gave Glasgow telephone numbers so that Glasgow could contact both Hines and Peveto in Texas. And Glasgow in fact traveled to Texas and talked with Hines. Glasgow R. 32, 37–38.

◼ Interstate travel need not be "essential to the illegal scheme as long as it makes the illegal objective 'less difficult' to accomplish." *United States v. Barbieri*, 614 F.2d 715, 718 (10th Cir.1980). It is true that no federal crime is committed when interstate travel is incidental to the illegal scheme or unrelated to any criminal objective. *Id.* Here, however, the jury could reasonably infer, from the evidence found at the Bryan County house and from the evidence found both in Peveto's and Hines' apartments in Texas, that interstate travel made the manufacturing of narcotics "less difficult" to accomplish. Moreover, there is substantial evidence in the record that Hines directed Glasgow's interstate travel. *See Kendall*, 766 F.2d at 1434. Glasgow purchased glassware at Hines' direction in Oklahoma and traveled to Texas to talk with Hines, where he received telephone numbers for both Hines and Peveto. The jury could reasonably conclude from this evidence that Hines "knew he was causing or aiding and abetting interstate travel."

---

**21.** In pertinent part, 18 U.S.C. § 1952 provides:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs ... (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

 (b) As used in this section "unlawful activity" means (1) any business enterprise involving ... narcotics or controlled substances....

**22.** Title 18 U.S.C. § 2 provides:
 (a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

*Id.* (citing *United States v. Villano*, 529 F.2d 1046, 1054 (10th Cir.1976), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976)).

 We are also unpersuaded that the evidence was insufficient to show that interstate travel was undertaken to facilitate a business enterprise involving narcotics or controlled substances. The unlawful activity the Travel Act is intended to prohibit, when the underlying offense involves narcotics or controlled substances, is a business enterprise. We define the term business enterprise to mean "a continuous course of conduct rather than a sporadic casual involvement in the proscribed activity." *United States v. Rinke*, 778 F.2d 581, 586 (10th Cir.1985) (quoting *Kendall*, 766 F.2d at 1434). Here, when viewed in the light most favorable to the government, the evidence was sufficient to show a continuous course of conduct rather than sporadic casual involvement in the manufacturing of amphetamine and methamphetamine.

Viewing the evidence in the light most favorable to the government, we conclude there is substantial evidence from which a jury could properly find Hines guilty beyond a reasonable doubt of violating the Travel Act or aiding and abetting in its violation. Accordingly, there was no error in the denial of Hines' motion for judgment of acquittal as to count six of the indictment.

## G.

### *The Government's Failure to Comply With Discovery Order*

 Defendant Hines' last argument is particularly disturbing. The government failed to provide important evidence until the day of trial, in clear violation of discovery orders. As a sanction, the court granted a two week continuance. Hines argues on appeal that the court abused its discretion in not imposing the more severe sanction of dismissal of the indictment or exclusion of the evidence in question.

Hines was arraigned on September 29, 1987 and the court set a trial date of November 2, 1987. Hines' attorney was notified by the Assistant United States Attorney on September 30, 1987 that various discovery materials would not be made available for one week. I R. 6. Hines' attorney then filed a motion for extension of time within which to file pre-trial motions. The court had set October 6, 1987 as the due date for pre-trial motions. The court granted Hines' request for additional time to file pre-trial motions.

By October 9, the new deadline for pre-trial motions, Hines had still not received the discovery material. On October 13 Hines filed a number of additional discovery motions and requested additional time to file pre-trial motions. On October 18 a "RECRIPROCAL MEMORANDUM OF DISCOVERY PURSUANT TO RULE 16 FEDERAL RULES OF CRIMINAL PROCEDURE" was entered into between the Assistant United States Attorney and Hines' attorney. I R. 24. The memorandum essentially provides that the parties should cooperate in providing discovery material under Fed.R.Crim.Proc. 16, including material under the Jencks Act and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

On October 21 the court entered an order granting in part and denying in part the various discovery motions filed by Hines, stating that "strict and good faith compliance by the government of the requirements of *Brady* and this order in all respects is hereby expressly directed." I R. 29. On October 22 the government provided some of the materials and informed Hines' attorney that other discoverable evidence was in the possession of law enforcement agents in Oklahoma City and Dallas. On October 23 Hines' attorney traveled to Oklahoma City and reviewed some evidence made available by Drug Enforcement Administration agents in Oklahoma City. He was again advised that not all discoverable items were present and that additional evidence remained in Dallas. During the following week Hines' attorney made several inquiries of the Assistant United States Attorney concerning the evidence in Dallas

and was advised that the evidence would be made available shortly.

On November 2, the day of trial, a significant amount of discovery material was made available to the defendants for the first time. III R. 4–24.[23] Expressing concern over the late disclosure of the evidence, the trial judge stated:

> You all [the United States Attorney's office] more or less have an open file policy, the only thing is you just don't put anything in your files. And it appears that the defendants are having to get things as best they can, and here at the last minute. If they are prejudiced by it, why, I'll just have to take some action which you may not like.

III R. 19–20. A jury was then selected. III R. 24–82. After reviewing the newly provided evidence defendants Williams and Hines filed motions requesting dismissal of the indictment or exclusion of the evidence.

The court held a hearing on this motion on November 4, prior to the beginning of the jury trial. At that time, a list of the evidence provided to defense counsel for the first time on November 2 was made available to the court. That evidence included, among other things, a box of photographs, two pistols, a significant number of assorted papers, handwritten notes, approximately 20 additional assorted photos, a notebook, a telephone listening device, a box of assorted bottles, labels, two baggies of amphetamines, a vial of clear liquid, gram scales, two razor blades, a syringe, a bottle of capsules, another box of records, two homemade bombs, photographs of twenty-five gallons of formic acid and sixteen cans of ether, miscellaneous narcotic paraphernalia, and other items far too numerous to mention here. *See* IV R. 20–31, 41–51.

When asked by the court to explain the late production of these materials, the Assistant United States Attorney conceded that the defendants were entitled to the material. IV R. 38–39. He stated, however, that the material was provided as soon as it was received by him and explained that he had trouble obtaining the material from the D.E.A. Agent. IV R. 64–65. The government attorney said that he understood the cases which "state that. when it's in possession of the agents it's in possession of the prosecutors for the government." IV R. 64. He conceded that other means could have been employed to insure timely disclosure.

Throughout the hearing on November 4 the court expressed great concern over the late disclosure of the evidence. The judge stated that he would have been "overwhelmed by all this material being presented, and [that the conduct of the United States Attorney's office was] certainly contrary to the intention the rules and the law and everything that you can find that is read to have this amount of material turned over at the last minute to try to have a lawyer, professional person, try to represent their client in a matter so serious. . . ." IV R. 67–68. The judge stated that "considering my past experience, I'm not at all surprised [by the conduct of the United States Attorney's Office]. . . ." *Id.* at 68. The judge had previously stated that "there has over a substantial period of time, nearly since I have been here, but at least with the present administration of the United States Attorney's office [been] a pattern of conduct or misconduct of not presenting evidence until very late, many times during the trial. . . ." IV R. 17–18. The judge concluded: "I want to inform you . . . [that this practice] is going to change instanter." IV R. 68. We consider the trial judge's comments and reprimand of the government fully justified.

As a remedy for the government's misconduct, the court granted a continuance of the trial to November 16, 1987. IV R. 70. The court concluded that the interest of justice would not be "served well by the dismissal of such a serious matter, because of some misdeeds of the Government." IV R. 68. The court considered excluding the evidence produced on November 2, but decided against that remedy. IV R. 69.

---

**23.** Citations to volumes three and four of the record in this section of the order refer to the hearings held on October 2 and 4, 1987, respectively.

The Federal Rules of Criminal Procedure give trial courts broad discretion in imposing sanctions on a party who fails to comply with a discovery order:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

Fed.R.Crim.Proc. 16(d)(2). *See United States Wicker*, 848 F.2d 1059, 1060 (10th Cir.1988); *United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir.1986). The district court's exercise of discretion is governed by several factors:

> When the government fails to comply with a discovery order, the factors the district court should consider in determining if a sanction is appropriate are (1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance. *United States v. Euceda–Hernandez*, 768 F.2d 1307, 1312 (11th Cir.1985); *Fernandez*, 780 F.2d at 1576.

*Wicker*, 848 F.2d at 1061. If a sanction is imposed, it should be the "least severe sanction that will accomplish ... prompt and full compliance with the court's discovery orders." *Id.* at 1060 (quoting *Fernandez*, 780 F.2d at 1576). *Cf. Bank Of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (holding that as a general rule a district court exceeds its supervisory power in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant and noting that many errors may be remedied by means other than dismissal). "A continuance may normally be the most desirable remedy for the government's failure to comply with a discovery order." *Wicker*, 848 F.2d at 1062.

The trial court was presented with an extremely difficult situation. The record reflects that the court carefully considered the relevant factors before ordering the continuance. The judge noted that "[it is] my duty and responsibility to see that [the defendants] do receive a fair trial." IV R. 69. We hold that it was not an abuse of discretion to order the less extreme sanction of continuance. And there being no showing of prejudice after that relief was granted, this claim of error does not call for reversal.

## III.

We AFFIRM the convictions of Hines and Peveto. Rodgers' conviction is REVERSED and as to him the case is REMANDED for a new trial.

SAFFELS, District Judge, concurring in part and dissenting in part.

The majority opinion in this case relies on the following evidence of a conspiracy between defendant Peveto and his co-defendants to justify admission of an out-of-court statement under Federal Rule of Evidence 801(d)(2)(E).

1. Peveto and his co-defendant Hines lived in the same apartment complex in Sherman, Texas.

2. Peveto and Hines moved at the same time to the same apartment complex in Irving, Texas.

3. An A.T.F. agent found a triple-beam scale (commonly used in the manufacture of methamphetamine) during his search of Peveto's apartment.

4. Investigators found various laboratory equipment and narcotics evidence in their search of the Bryan County house.

5. Hines told Glasgow that "he wanted to purchase some apartment buildings to be used for dope houses," and that ownership of the properties "could be concealed"; Hines then "wrote the word 'lawyer' on a piece of paper" and pointed in the direction of Peveto's apartment.

The majority has determined that the trial court did not err in finding that this evidence established defendant Peveto was a member of the conspiracy charged.

Because of the secretive nature of the crime of conspiracy, the evidence of that conspiracy will usually be largely circumstantial. *See United States v. Jones*, 808

F.2d 754, 756–57 (10th Cir.1987). However, the court must guard against "piling inference upon inference" in order to find that a conspiracy exists. *United States v. Butler*, 494 F.2d 1246, 1252 (10th Cir.1974) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)) "[M]ere suspicion or insinuation of guilt of conspiracy" is not sufficient to support a finding that a conspiracy exists. *United States v. McMahon*, 562 F.2d 1192, 1197 (10th Cir.1977). In order to establish that a defendant was a member of the conspiracy, the prosecution must show by direct or circumstantial evidence that the defendant possessed the requisite criminal intent. " 'The defendant lacks the requisite criminal intent if he does not know the conspiracy's objective,' and this knowledge must be shown by clear, unequivocal evidence." *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir.1982) (quoting *Direct Sales Co.*, 319 U.S. at 711, 63 S.Ct. at 1269).

The evidence presented at trial, and relied upon by the majority, fails to establish by a preponderance of the evidence that a conspiracy to manufacture methamphetamine existed between Peveto and his co-defendants. The lab equipment and other narcotics evidence seized in the Bryan County search provided a strong inference that Peveto's co-defendants, Hines and Rodgers, were involved in the manufacture of methamphetamines. However, there was no evidence seized in that search which would tie Peveto to that plan. The fact that the chemicals seized in both searches were similar proves nothing; without some indication that the defendants might have used some unique method of manufacturing methamphetamine, one can assume that anyone planning to manufacture that substance would use similar chemicals. Further, the triple-beam scale found in Peveto's apartment is again strong evidence that Peveto was involved in the manufacture of methamphetamine. However, he was not charged with manufacturing methamphetamine; rather, he was only charged with participating in the plan with Rodgers and Hines to manufacture methamphetamine. The scale found in his apartment does not tie him to the Hines/Rodgers plan. It is simply a standard piece of equipment for anyone manufacturing methamphetamine.

The inadequacy of those two pieces of evidence leaves us only with the "long term association" between Peveto and Hines, and the hearsay statement itself. Of course, the hearsay statement sought to be introduced may be considered in determining whether the defendant was part of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). But when the only evidence of participation in the conspiracy, other than that hearsay statement, is an "association" with the co-conspirators,[1] it seems the evidence of conspiracy is wholly insufficient to satisfy the prerequisites of Rule 801(d)(2)(E). The "association" with the conspirators only raises a "mere suspicion or insinuation of guilt of conspiracy." *McMahon*, 562 F.2d at 1197. It appears the majority has "pil[ed] inference upon inference," and has concluded without basis that a conspiracy existed between Peveto and his co-defendants. *Butler*, 494 F.2d at 1252. The "association" between Peveto and Hines is of little evidentiary value when that "association" is the only independent evidence of participation in a conspiracy. We are only left, then, with the hearsay statement itself. Thus, the effect of the majority's opinion is to allow the hearsay to stand alone as evidence of a conspiracy, and to abrogate the requirements of Rule 801(d)(2)(E). This is contrary to the intent of the Rule.

Further, the evidence of conspiracy relied upon by the majority completely fails, directly or circumstantially, to indicate intent on the part of Peveto to participate in Hines and Rodgers' conspiracy. There must be some direct or circumstantial evidence which clearly and unequivocally indicates the requisite criminal intent. *Dumas*, 688 F.2d at 86. Here we have no indication of any action taken by Peveto from which we might infer he intended to conspire with Hines and Rodgers.

Even if we were to consider the other evidence admitted against Peveto at trial, this evidence would still be insufficient to show by a preponderance of the evidence that Peveto participated in a conspiracy with Hines and Rodgers to manufacture methamphetamine. The strongest evi-

---

1. Hines at one point also gave Glasgow Peveto's phone numbers and he told Glasgow he could be reached there. The majority says this is further evidence of the conspiracy. It is instead only further evidence of the "long term association" between Peveto and Hines. Even if it provides some minor, circumstantial evidence of conspiracy, there is still a complete lack of direct or circumstantial evidence indicating Peveto had the requisite criminal intent to join his long term associate in his manufacturing operation. *See infra* discussion at p. 865.

dence against Peveto was discovered in a van in his locked garage. The van was owned by defendant Hines' son. There was also evidence that the van was seen earlier at the apartment owned by defendant Hines, but rented and occupied by Hines' son. When investigators searched Hines' son's apartment, they found a receipt for the chemicals discovered in the van in Peveto's garage. A traffic ticket found in the search of Peveto's apartment tied Peveto to the van. All of this evidence would be more than sufficient to charge and convict Peveto of conspiring with Hines' son to manufacture methamphetamine. But the record is devoid of any evidence which would indicate that the operation of Hines' son and Peveto was tied to that of defendants Hines and Rodgers.

Because it is felt that the district court clearly erred when it determined the government had shown by a preponderance of the evidence that Peveto was a participant in the charged conspiracy, I would dissent from that portion of the majority's opinion which upheld the district court's admission of the co-conspirator statement. Further, since the evidence is insufficient, without the hearsay statement, to show that Peveto was a participant in Hines and Rodgers' conspiracy, I would reverse and remand with instructions to direct a judgment of acquittal in favor of defendant Peveto. In all other respects, I concur with the majority's opinion.

### ORDER ON REHEARING

Before HOLLOWAY, Chief Judge, McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, and EBEL, Circuit Judges, and SAFFELS, District Judge.

On consideration by the hearing panel, Judges Holloway, Brorby and Saffels, the petition for rehearing of defendant-appellant Peveto is denied. In connection with the petition for rehearing, however, the panel majority, Judge Holloway and Judge Brorby note as follows:

Defendant Peveto has filed a petition for rehearing and suggestion for rehearing en banc. He asserts, among other things, that the panel erred in affirming the trial court's determination that Glasgow's testimony was admissible under Fed.R.Evid. 801(d)(2)(E). He asserts that the panel majority did not consider his claim that the statement was not made in the course of and in furtherance if the conspiracy. Peveto's brief on appeal did assert that the

statement was "hardly in furtherance of any conspiratorial purpose and could not form the basis, even in part, for a determination that a conspiracy existed." See principal brief of defendant/appellant p. 19. In our opinion, we stated that "nor does Peveto challenge the trial court's finding that the statement was made in furtherance of the conspiracy." See maj. op. at 852. Peveto is correct that this was in error, because of his statement in his brief, noted above.

 We went on to hold, however, that statements "intended to promote the conspiratorial objectives" are made in furtherance of the conspiracy as are statements "identifying a fellow coconspirator." Majority op. at 852 (citing *United States v. Smith*, 833 F.2d 213, 221–222 (10th Cir. 1987)). The holding was correct.

In accordance with Rule 35(b) of the Federal Rules of Appellate Procedure, the petition for rehearing and suggestion for rehearing en banc were transmitted to all the judges of the court in regular active service. No member of the hearing panel and no judge in regular active service on the court having requested that the court be polled on rehearing en banc, Rule 35, Federal Rules of Appellate Procedure, the suggestion for rehearing en banc is denied.